THE CITY OF ROCKFORD, Petitioner, *v.* THE POLLUTION CONTROL BOARD *et al.*, Respondents.

Second District   No. 2—83—0673

Opinion filed June 27, 1984.

Charles E. Box and Ronald N. Schultz, both of City of Rockford Department of Law, of Rockford, for petitioner.

Donald L. Shriver, of Downey, Yalden, Shriver & Walden, of Rockford, for respondents.

PRESIDING JUSTICE SEIDENFELD delivered the opinion of the court:

We review the order of the Illinois Pollution Control Board (PCB) approving the location of a site for a liquid industrial waste regional pollution control facility in Rockford to be constructed by Frink's Industrial Waste, Inc. (Frink's).

The city council of Rockford, as the governing body of the municipality, charged by statute with determining site location suitability (Ill. Rev. Stat. 1983, ch. 111½, par. 1039.2), denied the Frink's application. The PCB on review (Ill. Rev. Stat. 1983, ch. 111½, par. 1040(a)) granted approval. Rockford appeals.

The proposed facility is designed to treat four types of liquid waste: alkaline water, coolant and cutting oils, chromium and zinc phosphate effluents, and solvent-water mixtures.

Frink's proposes to collect from industries generating these wastes in the Rockford area and to carry them to its facility in 5,000 gallon capacity trucks. These trucks would unload their contents into covered tanks of various sizes at the proposed facility. From these tanks, Frink's would treat the wastes, reclaim some chemicals, discharge waste water into the Rockford Sanitary District sewers, and haul sludges to a landfill.

Frink's proposes to locate the facility in South By-Pass Industrial Park, at the southwest corner of Kishwaukee Street and Boeing Drive, in the city of Rockford, Illinois. Kishwaukee Street is a four-lane highway running north and south. Boeing Drive runs east and west, and serves as access to the Industrial Park. Several industrial concerns are already located in the Industrial Park, including one firm

that processes industrial oils by filtration.

Immediately to the north of South By-Pass Industrial Park is a four-lane, east-west highway known as Route 194 By-Pass, U.S. 20, which is elevated as it crosses Kishwaukee Street. North of Route 194 and west of Kishwaukee Street is the Rockford Sanitary District Treatment Plant and an industrial subdivision fronting on Kishwaukee Street. Riverdahl School is approximately 2,000 feet east of this subdivision across Kishwaukee Street and elevated Route 194. South of Route 194 and directly east of South By-Pass Industrial Park is a largely vacant tract owned by the Rockford Local Development Corporation. Sundstrand Corporation has recently built an industrial building on one part of the Local Development Corporation tract, along the east side of Kishwaukee Street.

I

Rockford first argues that the PCB erroneously reweighed the evidence and substituted its findings for those of the governing body of the municipality, although the contrary decision of the municipality was supported by sufficient evidence.

■ We first address the standard of review applicable to the proceedings before the city council. Rockford agrees that the manifest weight of the evidence standard applies, and contends that the council's decision denying site approval was not against the manifest weight of the evidence and should have been approved on review. This court has held that the manifest weight of the evidence standard applies to the review of site location decisions made by a governing body under section 39.2 of the Environmental Protection Act. Ill. Rev. Stat. 1983, ch. 111½, par. 1039.2. See *E & E Hauling, Inc. v. Pollution Control Board* (1983), 116 Ill. App. 3d 586, 608, *appeal allowed.*

Frink's contends that the PCB decision overruling Rockford's denial of site location approval was proper under the manifest weight of the evidence standard. It argues, however, that *E & E Hauling* is wrongly decided on this issue, and that the manifest weight of the evidence standard should only be applied to an administrative agency with recognized pollution control expertise, and not to the city council.[1] It reasons that the declared purposes of the Environmental Pro-

---

[1]Frink's also argues that *City of East Peoria v. Pollution Control Board* (1983), 117 Ill. App. 3d 673, 680, is wrongly decided on this issue. This opinion does not discuss that decision, however, because the Illinois Supreme Court has dismissed the appeal of the cause and vacated the decision of the appellate court as moot. *City of East Peoria v. Pollution Control Board* (No. 59110, May 24, 1984, unpublished order).

tection Act are to establish ecologically sound regional pollution control facilities to ease the recognized difficulty of disposing of refuse and to establish a unified statewide program for environmental protection. See Ill. Rev. Stat. 1983, ch. 111½, pars. 1002(a)(ii), 1020(b); see also *Carlson v. Village of Worth* (1975), 62 Ill. 2d 406.

Pending supreme court review, we adhere to the manifest weight standard.

Our conclusion is supported by an analysis of the Environmental Protection Act (Ill. Rev. Stat. 1983, ch. 111½, par. 1001 *et seq.*). Section 3(a) of the Act defines "Agency" as the Environmental Protection Agency and defines "Board" as the Pollution Control Board. (Ill. Rev. Stat. 1983, ch. 111½, par. 1003(a), (c).) Section 39 deals with the issuance of permits. (Ill. Rev. Stat. 1983, ch. 111½, par. 1039.) Section 39(a) allows the Board to require permits and requires the agency to issue permits upon proof that the applicant has complied with the Act. (Ill. Rev. Stat. 1983, ch. 111½, par. 1039(a).) Section 39(c) requires the applicant who proposes to develop or construct a new regional pollution control facility first to obtain proof that the local government entity has approved the site location in accordance with section 39.2 of the act. (Ill. Rev. Stat. 1983, ch. 111½, pars. 1039(c), 1039.2.) Section 39.2, at issue in this case, requires the local governing entity to approve site location suitability considering six listed criteria which together have the effect of making a uniform set of zoning standards for the location of regional pollution control facilities throughout the State. Houlihan & Flynn, *The Siting of Sanitary Landfills and Other Waste Management Facilities—The Legislature Acts*, 70 Ill. B.J. 434, 437 (1982).

■ Comparing section 39(a), granting the agency general authority to issue permits, with section 39.2, granting the local governmental entity authority to approve site location, it appears that the local governmental entity has been given the adjudicatory function otherwise located in the agency itself. The fact that the statute contains parallel review procedures in section 40 (Ill. Rev. Stat. 1983, ch. 111½, par. 1040, providing for Board review of Agency denial of permits), and in section 40.1 (Ill. Rev. Stat. 1983, ch. 111½, par. 1040.1, providing for Board review of local governmental entity denial of site location approval), reinforces the view that in site location decisions the local governmental entity performs an adjudicatory function. Adjudicatory decisions made by an administrative agency are reviewed under a manifest weight of the evidence standard. See *Wells Manufacturing Co. v. Pollution Control Board* (1978), 73 Ill. 2d 226, 234; *Environmental Protection Agency v. Pollution Control Board* (1980),

88 Ill. App. 3d 71, 77.

## II

■ We conclude that the PCB properly found Rockford's siting decision to be against the manifest weight of the evidence.

The Pollution Control Act provides criteria which the local governing bodies are to apply in deciding site location suitability. (Ill. Rev. Stat. 1983, ch. 111½, par. 1039.2(a)(i-vi).) The council's resolution adopting the amended recommendation of the Rockford Committee on Community Development found that the criterion that the proposed facility was necessary to accommodate the waste needs of the area it was intended to serve was met, noting the express needs of the durable goods manufacturers in the area, the strict State and Federal laws for proper disposal of industrial wastes, and the high cost of disposal outside the area. Applying the remaining statutory criteria, the resolution found that: the facility was outside the boundary of the 100-year flood plain by one-quarter of a mile; the facility was designed to minimize the danger to the surrounding area from fires, spills or other operational activities, by incorporating "many safety features" and "numerous backups" with monitoring of operations by the Rockford Sanitary District and the EPA; the traffic patterns for the facility, characterized as a capital, not labor, intensive operation, were designed to have minimal impact on existing traffic flows.

The area of controversy is relatively narrow and involves only the particular location and the compatibility of the operation with the character of the surrounding area. Respecting the criterion of health, safety and welfare, the council's resolution states that "[t]he design of the plant incorporates many features to protect the health and safety of the public and was made by a well qualified engineering firm," and that "[t]he proposed operation of the facility would appear to protect the public health, safety and welfare if such operation is performed properly." It concluded, however, that the particular criterion had not been met because:

> *"Location*
> Testimony received at the January 24, 1983 public hearing and the application itself evidence the extremely hazardous nature of the chemicals to be handled. Therefore despite many favorable design features, the risk to public health should any of these design features fail or accidents in transport occur must be considered. Riverdahl School is located approximately 2,000 feet northeasterly of the proposed site and is served by well

water. The risk to the health and safety of the children of this school, considering the hazardous waste to be treated and its largely unknown effects, is unacceptable. The public's overwhelming concern about the site location in relation to Riverdahl School is evidenced in the public hearing of January 24, 1983."

It also concluded that the further criterion relating to the location of the facility so as to minimize incompatibility with the character of the surrounding area and minimize the effect on value of surrounding property had not been met. The amended report indicated that the opinion of appraiser Dale Scott, stating that devaluation of the property will not occur, is undisputed, but noted that:

"2. Correspondence received from Honeywell, which has a facility on an adjacent parcel, indicates incompatibility due to the existence of one pollution control facility in the Industrial Park already. Therefore, the use of this area for general industrial purposes may deteriorate into an exclusive site for disposal facilities.

3. The site is incompatible with the nearby location of Riverdahl School, due to the inherent risks of handling hazardous wastes. Short of relocating the school, it is doubtful that satisfactory measures could be taken to further minimize this incompatibility."

First, any adverse effect of the facility on surrounding property values is neither evident from the record nor emphasized by Rockford. It concedes in its brief, in fact, that "it is very likely that the proposed site in this case would have been approved were it not for the school being in such close proximity." Letters from many of the surrounding industrial neighbors approving the location of the facility are in evidence. Of these, only one, from Honeywell, opposed the facility because it believed that an existing facility, namely Interstate Pollution Control Company, in the Industrial Park, was sufficient and that a second waste facility might cause the area to deteriorate into an exclusive site for disposal facilities. The undisputed testimony of the real estate appraiser, W. Dale Scott, was that any detrimental effect on nearby residential values had already occurred as a result of the existing industrial uses and that the proposed site in the industrial area was appropriate for a waste treatment facility.

It is apparent that the decision to deny approval is largely based on the Riverdahl School objection. There was testimony that the school is 2,000 feet downwind from the proposed site and is served by a ground water well, and that trucks carrying hazardous waste to and

from the site will travel on Kishwaukee Street, in front of the school and on the elevated highway just south of the school. The principal of the school, however, agreed that there are other existing industrial uses within the neighborhood including Honeywell to the west, Sundstrand to the south, and Gates Rubber to the east, and that railroad tracks lie directly behind the school.

There was evidence that the system would be entirely enclosed with separate piping, tanks and processing systems for each type of waste treated which would allow prompt discovery and repair of any leaks. The plan includes curbing around the tank areas to contain spills, a ventilation system which passes through activated carbon to prevent odors and fumes from escaping, and a negative air flow within the system to minimize risk of explosion or fire. Evidence also showed that the waste, before treatment, will be approximately 90% water, and that the recovered products are less flammable than other hazardous materials commonly transported on Rockford streets. Frink's documentation supports its position, and there is little scientific documentation of the risks that the city fears.

The PCB found "that the risks posed by the Frink's wastes are mitigated by the fact that they are diluted with water from 10% to 90%, depending upon the type of waste, and by the containment methods included in the facility design." The PCB concluded in its report that "[r]educed to its essence, the conclusion [of the city council] is that any element of risk is unacceptable, and that no 'satisfactory measures could be taken to further minimize [the] incompatibility' of the proposed Frink's site with the school since there is no way to guarantee that failures and accidents will not occur." As Frink's argues and we agree, this conclusion by the city council does not support its denial under the statute. The statute speaks of minimizing incompatibility and danger from accidents, it does not speak of guaranteeing no increase of risk concerning any of the criteria. Ill. Rev. Stat. 1983, ch. 111½, par. 1039.2; and see *E & E Hauling v. Pollution Control Board* (1983), 116 Ill. App. 3d 586, 614.

■ We also find no basis for Rockford's claim that the PCB substituted its own conclusions rather than basing its review on the record. The tenor of the decision of the PCB was that there were no special circumstances which could support the city's conclusion that the proposed site was located too close to the Riverdahl School based "on its own review of the record."

The manifest weight of the evidence indicates that a contrary result from that reached by Rockford is clearly evident. (See *Jenkins v. Universities Civil Service Merit Board* (1982), 106 Ill. App. 3d 215,

219.) We therefore affirm the decision of the Illinois Pollution Control Board.

Affirmed.

LINDBERG, and HOPF, JJ., concur.