HORACE FILE *et al.*, Petitioners-Appellants, v. D & L LANDFILL, INC., *et al.*, Respondents-Appellees.

Fifth District   No. 5—90—0630

Opinion filed October 3, 1991.

James E. Buchmiller, of Greenville, for petitioners.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Elizabeth Schroer Harvey, Special Assistant Attorney General, of Chicago, of counsel), for respondent Pollution Control Board.

W.A. Dillow III, of Greenville, for respondent D & L Landfill, Inc.

JUSTICE WELCH delivered the opinion of the court:

On October 10, 1989, appellee, D & L Landfill, Inc., filed an application with the Bond County Board of Supervisors for siting approval for a regional pollution control facility. Application was made pursuant to section 39(c) of the Environmental Protection Act, which provides that

> "no permit for the development or construction of a new regional pollution control facility may be granted by the [Environmental Protection] Agency unless the applicant submits proof to the Agency that the location of said facility has been approved by the County Board of the county if in an unincorporated area *** in accordance with Section 39.2 of this Act." (Ill. Rev. Stat. 1989, ch. 111½, par. 1039(c).)

After an extensive public hearing held January 24, 1990, the Bond County Board of Supervisors entered an order on April 3, 1990, granting the site approval subject to numerous specified conditions.

On May 7, 1990, appellants, a group of 35 citizens of Bond County calling themselves Bond County Concerned Citizens, who had participated in the hearing before the Bond County Board of Supervisors, filed a petition with the Illinois Pollution Control Board for a hearing to contest the decision of the Bond County Board of Supervisors. Their petition was filed pursuant to section 40.1(b) of the Environmental Protection Act, which provides:

> "[i]f the county board *** grants approval under Section 39.2 of this Act, a third party other than the applicant who participated in the public hearing conducted by the county board *** may petition the [Pollution Control] Board within 35 days *** to contest the approval of the county board." (Ill. Rev. Stat. 1989, ch. 111½, par. 1040.1(b).)

In their petition, appellants alleged that the finding of the Bond County Board of Supervisors that the applicant had satisfied the requirements of section 39.2 of the Environmental Protection Act was against the manifest weight of the evidence in several respects.

Section 39.2 of the Environmental Protection Act provides in relevant part as follows:

> "(a) The county board of the county *** shall approve or disapprove the request for local siting approval for each regional pollution control facility which is subject to such review. An applicant for local siting approval shall submit sufficient details describing the proposed facility to demonstrate compliance, and

local siting approval shall be granted only if the proposed facility meets the following criteria:

(i) the facility is necessary to accommodate the waste needs of the area it is intended to serve;

(ii) the facility is so designed, located and proposed to be operated that the public health, safety and welfare will be protected;

(iii) the facility is located so as to minimize incompatibility with the character of the surrounding area and to minimize the effect on the value of the surrounding property;

(iv) the facility is located outside the boundary of the 100 year flood plain or the site is flood-proofed;

(v) the plan of operations for the facility is designed to minimize the danger to the surrounding area from fire, spills, or other operational accidents;

(vi) the traffic patterns to or from the facility are so designed as to minimize the impact on existing traffic flows.

\* \* \*

The county board \* \* \* may also consider as evidence the previous operating experience and past record of convictions or admissions of violations of the applicant \* \* \* in the field of solid waste management when considering criteria (ii) and (v) under this Section." Ill. Rev. Stat. 1989, ch. 111½, par. 1039.2(a).

Appellants' petition alleged that the Bond County Board of Supervisors' findings with respect to criteria (i), (ii), (iii), and (vi) were against the manifest weight of the evidence and that the evidence indicated previous operating violations by the applicant. The petition prayed that the Pollution Control Board reverse the decision of the Bond County Board of Supervisors granting site location approval to D & L Landfill, Inc.

On July 11, 1990, the Pollution Control Board held a hearing on appellants' petition. In accordance with section 40.1(b) of the Environmental Protection Act, the Bond County Board of Supervisors and D & L Landfill, Inc., were named as co-respondents, the hearing was based exclusively on the record before the county board, and appellants bore the burden of proof. (Ill. Rev. Stat. 1989, ch. 111½, par. 1040.1(b).) On August 30, 1991, the Pollution Control Board issued its opinion and order affirming the decision of the Bond County Board of Supervisors. Attached to the opinion were a separate concurring opinion and a dissenting opinion. The dissenting opinion found that the Bond County Board of Supervisors' finding as to the need for the landfill (criterion (i)) was against the manifest weight of the evidence.

Appellants appeal to this court pursuant to section 41(a) of the Environmental Protection Act, which provides that any party to a hearing before the Pollution Control Board may obtain judicial review in the appellate court pursuant to the Administrative Review Law (Ill. Rev. Stat. 1989, ch. 110, par. 3—101 *et seq.*). (Ill. Rev. Stat. 1989, ch. 111½, par. 1041(a).) On appeal, they argue that the opinion and order of the Pollution Control Board affirming the decision of the Bond County Board of Supervisors is against the manifest weight of the evidence in that the evidence presented at the hearing before the Bond County Board of Supervisors failed to show compliance with criteria (i), (ii), (iii), and (vi) of section 39.2(a) of the Environmental Protection Act.

The standard of review to be exercised by both the Pollution Control Board and this court is whether, respectively, the decisions of the county board and Pollution Control Board are contrary to the manifest weight of the evidence. (*Waste Management of Illinois, Inc. v. Pollution Control Board* (1988), 175 Ill. App. 3d 1023, 530 N.E.2d 682.) This court should not reweigh the evidence or substitute its judgment for that of the agency (*McHenry County Landfill, Inc. v. Environmental Protection Agency* (1987), 154 Ill. App. 3d 89, 100, 506 N.E.2d 372, 379), and a decision is contrary to the manifest weight of the evidence only if the opposite result is clearly evident, plain, or indisputable from a review of the evidence. (*Tate v. Pollution Control Board* (1989), 188 Ill. App. 3d 994, 1022, 544 N.E.2d 1176, 1195.) We must determine whether the decision of the Pollution Control Board that the Bond County Board's finding that D & L Landfill, Inc., had satisfied the requirements of section 39.2 was not against the manifest weight of the evidence is itself against the manifest weight of the evidence. To do so we must review the evidence presented to the Bond County Board.

David Kimmle, a civil engineer, testified on behalf of applicant. Kimmle had helped prepare the application for D & L Landfill, Inc. He explained that the new landfill for which D & L Landfill, Inc., sought approval was an expansion of, and adjacent to, its existing landfill. Out of 193 acres of property, 72 would be used for trash placement. A tree and shrub line was going to be placed along the highway in hopes of concealing the site. The Environmental Protection Agency required a 200-foot setoff between the border of the property and the area of trash placement. Soil borings indicated that the site is primarily glacial till, which is a hard, compact soil. Throughout the site, there are numerous sand lenses, which are small seams of sand associated with ground water. Applicant planned to ex-

cavate down to the hard glacial till, excavating out any sand lenses. The Environmental Protection Agency requires 10 feet of suitable clay liner at the bottom of the landfill before trash placement may occur. Applicant hoped to use the existing glacial till as its clay liner. Any sand lenses or unsuitable soil would be excavated and replaced with clay. Kimmle believed that, with this plan, there would be no groundwater contamination.

When the site begins operation, approximately 10 to 15 monitor wells will be placed around the site. Three to four will be upgradient, giving a background analysis of the groundwater. The rest will be located in the lowland area and will indicate if leachate is migrating from the site. Four times a year, an independent firm, hired and paid by applicant, will sample and test the groundwater from these wells for contaminants.

On cross-examination by the attorney for Bond County Concerned Citizens, Kimmle explained that he had only graduated from college in 1986 and had only been an engineer for 3½ years. The present landfill was the second one which he had helped to design. One had been completed. Kimmle had closed none. Kimmle testified regarding a letter he had received from a hydrogeologist with the Illinois State Geological Survey. Such a report is required by the Environmental Protection Agency. Its purpose is to determine whether the proposed landfill will affect the drinking water at the site. The report found a moderate chance of groundwater contamination from the proposed site expansion. The report indicated that shallow sand is widespread throughout the area and has been used as a drinking water source for several people living near the proposed expansion. Such material has a relatively high potential for contamination. The report concluded that the native geologic materials at the proposed landfill expansion appear to offer only a moderate to low level of protection to the shallow sand and gravel aquifer present in the area.

Kimmle did not agree with the report and indicated that the shallow sand referred to the sand lenses which would be excavated out. The hydrogeologist had not visited the site, but used soil borings sent by applicant. All sand lenses will be excavated out and replaced with suitable material, thereby protecting the shallow groundwater. Kimmle explained that there would also be a sheet of synthetic material placed on top of the glacial till and sealed. On top of that would go one foot of sand, which would act as a leachate collection system. The sand is dumped on the synthetic sheet by trucks and pushed out by dozers. Trucks weighing 20 to 40 tons would be driving over this sand layer. Kimmle did not believe holes would be punched in the syn-

thetic membrane by this process. Selected trash (excluding such things as car batteries and metal) is then placed in the first four feet of depth of the landfill. Trash is dumped in layers of four feet and then compacted. Kimmle did not see a substantial danger of holes being punched in the synthetic membrane.

When the entire landfill is filled, it will be approximately 20 to 30 feet above the highway elevation. Oak trees will be planted around the perimeter. It will take 20 to 30 years for these trees to grow enough to block the site. The trees will lose their leaves in the winter.

Kimmle was cross-examined about a report by the Environmental Protection Agency to the Governor of the State of Illinois which indicated that the existing Bond County landfill was estimated to have a remaining useful life of 16 years. Kimmle disputed this figure. He described the remaining capacity of the existing landfill as very minimal.

Kimmle explained that, in an effort to minimize incompatibility with the surrounding area, the height of the completed landfill would be limited to 20 to 30 feet above the highway, a six-foot-high woven-wire perimeter fence would be installed, and the landfill would be covered with clean dirt at the end of each day. Kimmle admitted that he did not think the fence would contribute much. Providing daily cover would reduce odor, rodents, birds, and flies.

In order to minimize impact on existing traffic flows, the entrance to the new landfill will be via the existing landfill. Traffic patterns will not be changed. There could possibly be an increase in the amount of traffic.

The new landfill has a projected life span of 29 years. In order to insure that the landfill will be properly taken care of over the years, the owners must post a sufficient bond to provide funds to care for the site for a 15-year period after closing.

Kimmle did not conduct a study to determine the effect of the new landfill on surrounding property values. The plan included nothing for earthquake preparedness although earthquakes had occurred in the area in the past. None had been serious enough to do damage to the landfill.

Kimmle acknowledged that there is a spring on the site of the proposed landfill. This spring would be excavated out.

Thomas Connor, another civil engineer, was called to testify on behalf of applicant. He graduated from college in 1972. For the past 18 years, he had been working in the area of geotechnical engineering, which involves soil, rock, and hydrology. He also worked on the design for the proposed landfill. He explained that any leachate collected by the layer of sand on top of the synthetic membrane would

be treated and not discharged into the groundwater. Even if leachate got down to the clay liner, it would take years for it to reach the groundwater. If a hole was punched in the synthetic liner, the effect on groundwater would be minimal. Furthermore, the monitor wells will ensure that, if leachate does get through, it will be detected and remedial actions taken. Connor described the life of the existing landfill as minimal, less than two years.

On cross-examination, Connor explained that they hoped to use the existing glacial till as their 10-foot clay liner. If the glacial till did not meet specifications, clay would be trucked in.

Leroy Wiese and Mike Eaton testified for applicant that each had purchased homes approximately 900 feet from the existing landfill and the proposed landfill site. On cross-examination, Eaton testified that he believed the proposed expansion of the landfill would devalue his home. Eaton had paid $62,500 for the home. He can see the existing landfill from his home.

Thomas Connor was recalled by applicant. He testified that around the perimeter of the site the dirt will be built up so as to shield the trash operations from the roadway. The hill will be landscaped and mowed and maintained. After the landfill is completed and closed, it will be landscaped and maintained and any problems must be corrected. All trash must be covered daily with six inches of soil.

Diana Johnston testified for applicant that she is with the Bond County Health Department. She is a registered sanitarian and has a bachelor's degree in environmental studies and planning. She is familiar with the site of the proposed landfill and has done soil and water studies at the site. The Bond County Health Department has no objection to the proposed landfill.

On cross-examination, Johnston was asked whether she was aware of a letter from the Environmental Protection Agency to Senator Frank Watson which detailed certain violations by the existing landfill. D & L Landfill, Inc., had been cited and penalized for various violations over the years.

On redirect examination, Johnston testified that the soil found at the proposed site is one of the better types found in the county for a landfill. She also testified that as of September 20, 1988, and August 23, 1989, D & L Landfill, Inc., was found to be in full compliance with all Illinois Environmental Protection Agency regulations. The applicant rested.

Bond County Concerned Citizens called Erwin Hediger to testify. He lives right across the highway from the site of the proposed landfill, probably 250 to 300 feet from the actual area of the fill. He has a

fruit orchard and farm on the property. He identified an aerial photograph of the area surrounding the proposed landfill. There are approximately 20 houses in close proximity to the site. Many are within 800 feet of the proposed site. He opined that the proposed landfill will reduce property values in the area. He identified appraisals of property in the area of the proposed landfill done by area realtors. They estimated that property values would be reduced by at least 45% to 50%.

Hediger testified that traffic on the road passing the proposed site is heavy. The road is very narrow. Hediger is opposed to the proposed landfill.

LeRoy McCray testified that he and his brother Don own D & L Landfill, Inc. The two brothers own a considerable amount of real estate in Bond County. Some of it is of sufficient size to be used as a landfill and is farther from any residential developments than the proposed site. At this point, Bond County Concerned Citizens rested.

The county board then allowed comments from others in attendance. The chairman and president of the Industrial Commission of the City of Greenville stated that the proposed new landfill was needed to attract new industry to the area. Most others were opposed to the proposed landfill. Several exhibits were admitted into evidence.

The Bond County Board of Supervisors found that, with the imposition of certain conditions, the applicant had satisfied the requirements of section 39.2 of the Environmental Protection Act and granted approval for the proposed landfill location. Those conditions include a monthly cap on the amount of trash to be disposed of at the site; a comprehensive plan for collecting and disposing of leachate from the leachate collection system; set-back lines of 500 feet, a green belt of dense evergreen screening at least six rows in depth, and limited hours of operation.

In its opinion and order, the Pollution Control Board set forth the law and evidence and found as follows:

Criterion (i) (need)—"The Board finds that the County Board could have reasonably rejected reliance upon the Agency's report [that the existing landfill had a remaining life span of 16 years] and concluded that the proposed facility is needed based upon the testimony presented by D & L [that the life span of the existing landfill was minimal, less than two years]. The County Board could have also accepted the evidence of remaining capacity in the Agency report, yet still concluded [sic] that the proposed facility is 'needed'. As noted above, merely because the County Board could have drawn different inferences and conclusions from this conflicting testimony is not a ba-

sis for this Board to reverse the County Board's finding. [Citation.] The Board cannot say, based upon the record, that the County Board's decision that the proposed facility is necessary is *** against the manifest weight of the evidence."

Criterion (ii) (public health)—"D & L provided sufficient evidence, both in its application and supporting documents and testimony, to support the County Board's decision that criterion 2 has been satisfied."

Criterion (iii) (incompatibility)—"D & L presented sufficient evidence of proposed measures to be taken to minimize the proposed facility's impact on the surrounding area. The County Board could reasonably have concluded that D & L's proposed actions were reasonably calculated to minimize incompatibility. Additionally, criterion 3 requires only that the applicant establish that the facility be located to minimize, not eliminate, the effect on surrounding property values. The Board cannot say that the County Board's rejection of reliance upon the realtor's appraisals, where those persons were not available for cross-examination, is wholly unwarranted in light of testimony that homes were purchased near the existing [landfill]."

Criterion (vi) (traffic flow)—"Given the evidence concerning use of the existing entrance to the [existing landfill], the County Board could have concluded that the impact on existing traffic patterns would be minimal. Again, the Board is constrained in its review by the 'manifest weight of the evidence standard of review' and concludes that the County Board, being familiar with the means of access to the proposed facility, could have reasonably concluded that D & L met its burden of proof on criterion 6."

■ We agree with the Pollution Control Board that the findings of the Bond County Board of Supervisors are not against the manifest weight of the evidence and therefore affirm the decision of the Pollution Control Board. In support of our decision, we will briefly discuss the law with respect to each criterion as it applies to the facts of this case.

With respect to the requirement of showing that the new landfill is necessary to accommodate the waste needs of the area it is intended to serve, the applicant need not show absolute necessity. However, the applicant must demonstrate an urgent need for the new facility as well as the reasonable convenience of establishing a new or expanding an existing landfill. (*Waste Management of Illinois, Inc. v. Pollution Control Board* (1988), 175 Ill. App. 3d 1023, 1031, 530 N.E.2d 682, 689.) The applicant must show that the landfill is reasonably required by the waste needs of the area, including consideration

of its waste production and disposal capabilities. (*Waste Management of Illinois, Inc.*, 175 Ill. App. 3d at 1031, 530 N.E.2d at 689.) The applicant need not show that every other potential landfill site in the region is unsuitable but must show more than mere convenience. *Waste Management of Illinois, Inc. v. Pollution Control Board* (1984), 123 Ill. App. 3d 1075, 1084, 463 N.E.2d 969, 976.

In the instant case, the only evidence with respect to need was contradictory. Witnesses for applicant testified that the existing Bond County landfill had a minimal life span. However, a report by the Environmental Protection Agency to the Governor of the State of Illinois indicated that the landfill had an estimated lifespan of 16 years. Both the county board and the Pollution Control Board found that the evidence of a minimal life span was credible and persuasive. It is not for us to reweigh this evidence. *McHenry County Landfill, Inc. v. Environmental Protection Agency* (1987), 154 Ill. App. 3d 89, 100, 506 N.E.2d 372, 379.

With respect to the second criterion, that the facility be so designed, located, and proposed to be operated that the public health, safety, and welfare will be protected, the evidence was again conflicting. It has been held that the determination of this question is purely a matter of assessing the credibility of expert witnesses. *Fairview Area Citizens Taskforce v. Pollution Control Board* (1990), 198 Ill. App. 3d 541, 552, 555 N.E.2d 1178, 1185.

Again, in the instant case, the county board and the Pollution Control Board found the applicant's expert witnesses to be credible and persuasive. It is noteworthy that Bond County Concerned Citizens presented no expert testimony on this point other than a letter from a hydrogeologist which was disputed by applicant. Again, it is not our place to reweigh the evidence. *McHenry County Landfill, Inc.*, 154 Ill. App. 3d at 100, 506 N.E.2d at 379.

The third disputed criterion is whether the proposed facility is located so as to minimize incompatibility with the character of the surrounding area and to minimize the effect on the value of the surrounding property. This criterion requires an applicant to demonstrate more than minimal efforts to reduce the landfill's incompatibility. An applicant must demonstrate that it has done or will do what is reasonably feasible to minimize incompatibility. (*Waste Management of Illinois, Inc. v. Pollution Control Board* (1984), 123 Ill. App. 3d 1075, 1090, 463 N.E.2d 969, 980.) Furthermore, an applicant should not be able to establish compatibility based upon a preexisting facility. (*Waste Management of Illinois, Inc.*, 123 Ill. App. 3d at 1088, 463 N.E.2d at 979.) It is important to note, however, that the statute does not speak

in terms of guaranteeing no increase of risk concerning any of the criteria. *City of Rockford v. Pollution Control Board* (1984), 125 Ill. App. 3d 384, 390, 465 N.E.2d 996, 1001.

We agree with the Pollution Control Board that the evidence before the county board indicates that D & L Landfill, Inc., will take whatever actions are reasonably feasible to minimize incompatibility. Indeed, the conditions placed upon the site approval by the Bond County Board of Supervisors go a long way toward minimizing incompatibility with the surrounding area and minimizing the effect of the expanded landfill on the value of surrounding property. The decision of the Pollution Control Board on this point is not against the manifest weight of the evidence.

■ The final criterion which the parties dispute is whether the traffic patterns to or from the facility are so designed as to minimize the impact on existing traffic flows. This criterion does not refer to traffic noise or dust, nor does it relate to the potential negligence of the truck drivers. (*Tate v. Pollution Control Board* (1989), 188 Ill. App. 3d 994, 1024, 544 N.E.2d 1176, 1196.) The operative word is "minimize," and it is recognized that it is impossible to eliminate all problems. *Tate*, 188 Ill. App. 3d at 1024, 544 N.E.2d at 1196.

The evidence in the instant case supports the findings of the county board and the Pollution Control Board that D & L Landfill, Inc., has made a reasonable effort to minimize the impact of the expanded landfill on existing traffic flows. Indeed, existing traffic flows will be impacted only slightly as all trucks entering or leaving the landfill will be using the existing entrance. Any impact on existing traffic flows will result only from any increase in traffic which, according to the evidence, should not be substantial.

In conclusion, we find that the decision of the Pollution Control Board affirming the decision of the Bond County Board of Supervisors granting site approval is supported by evidence and is not contrary to the manifest weight thereof.

For the foregoing reasons, the decision of the Pollution Control Board is hereby affirmed.

Affirmed.

RARICK, P.J., and HARRISON, J., concur.