Docket Nos. 101619, 101652 cons.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

---

TOWN & COUNTRY UTILITIES, INC., *et al.*, Appellees, v. THE
ILLINOIS POLLUTION CONTROL BOARD *et al.*, Appellants.

*Opinion filed March 22, 2007.*

JUSTICE FITZGERALD delivered the judgment of the court,
with opinion.

Chief Justice Thomas and Justices Freeman, Kilbride, Garman,
Karmeier, and Burke concurred in the judgment and opinion.

## OPINION

This case arises out of an application to site a landfill filed by
Town & Country Utilities, Inc., and Kankakee Regional Landfill,
LLC (collectively, Town & Country). Under the Environmental
Protection Act (Act), siting applications are to be heard by a local
governing body, here the City of Kankakee (City). 415 ILCS 5/39.2
(West 2002). After a hearing, the City approved the application. The
County of Kankakee (County) petitioned for a hearing before the
Illinois Pollution Control Board (Board) to contest the City's
decision. 415 ILCS 5/40.1 (West 2002). The Board reversed the
City's finding that the application met the statutory criterion that the
site be "so designed, located and proposed to be operated that the

public health, safety and welfare will be protected." 415 ILCS 5/39.2(a)(ii) (West 2002). Town & Country appealed. 415 ILCS 5/41 (West 2002); 735 ILCS 5/3–101 *et seq.* (West 2002). The appellate court set aside the Board's decision, over a dissent, finding that the local authority was entitled to deference on this criterion rather than the Board. No. 3–03–0025 (unpublished order under Supreme Court Rule 23). We granted the Board's and the County's petition for leave to appeal. 210 Ill. 2d R. 315. The central issue in this case is whether we must apply the manifest weight of the evidence standard of review to the City's decision or to that of the Board. We believe the standard of review should apply to the Board's decision and reverse the decision of the appellate court.

BACKGROUND

As the record in this case is lengthy, we summarize only the evidence necessary for an understanding of the instant matter. Initially, a review of the legal framework will be presented as a context for the issues. The authority of the Board finds its roots in the Illinois Constitution of 1970, which provides: "The public policy of the State and the duty of each person is to provide and maintain a healthful environment for the benefit of this and future generations. The General Assembly shall provide by law for the implementation and enforcement of this public policy." Ill. Const. 1970, art. XI, §1. In accordance with this directive, the General Assembly adopted the Environmental Protection Act in 1970. 415 ILCS 5/1 *et seq.* (West 2002). The purpose of the Act is "to establish a unified, statewide program" which, along with other remedies, is "to restore, protect and enhance the quality of the environment, and to assure that adverse effects upon the environment are fully considered and borne by those who cause them." 415 ILCS 5/2(b) (West 2002). Further, the legislature intended the Act to be liberally construed so as to effectuate its purposes. 415 ILCS 5/2(c) (West 2002).

The legislature established the Illinois Environmental Protection Agency (IEPA) (415 ILCS 5/4 (West 2002)) and the independent Pollution Control Board (415 ILCS 5/5 (West 2002)) to implement the Act. The Board consists of seven technically qualified members. 415 ILCS 5/5(a) (West 2002). The Board has authority to conduct proceedings, *inter alia*, "upon petition for review of the Agency's

final determinations on permit applications in accordance with Title X [415 ILCS 5/39 *et seq.*]" and "other proceedings as may be provided by this Act or any other statute or rule." 415 ILCS 5/5(d) (West 2002).

All waste permitting is governed by title X of the Act (415 ILCS 5/39 through 402 (West 2002)). Generally, an applicant for a new pollution control facility must apply to the Agency to receive a permit. 415 ILCS 5/39(a) (West 2002). In 1981, the legislature amended the Act to require local government siting approval as a precondition to the issuance of an Agency permit. Pub. Act 82–682, eff. November 12, 1981; 415 ILCS 5/39(c) (West 2002). Prior to this amendment, commonly known as Senate Bill 172, this court had ruled that zoning ordinances of non-home-rule units of local government related to facilities governed by the Act were preempted by the Act. *County of Cook v. John Sexton Contractors Co.*, 75 Ill. 2d 494 (1979); see also *City of Elgin v. County of Cook*, 169 Ill. 2d 53, 64 (1995). Senate Bill 172 overruled that decision and made clear that all units of local government, home rule and non-home-rule alike, have "concurrent jurisdiction" with the Agency in approving siting, subject to the criteria in section 39.2. *City of Elgin*, 169 Ill. 2d at 64; Pub. Act 82–682, eff. November 12, 1981; 415 ILCS 5/39.2(c) (West 2002).

The Act provides that a local siting application shall be granted only if the proposed facility meets nine discrete criteria. 415 ILCS 5/39.2(a) (2004). That section requires the local siting authority to hold a public hearing and issue a written decision. 415 ILCS 5/39.2(d), (e) (West 2002). Among these requirements the proposed facility is "so designed, located and proposed to be operated that the public health, safety and welfare will be protected." 415 ILCS 5/39.2(a)(ii) (West 2002).

The local siting authority's decision may be appealed to the Board upon request. 415 ILCS 5/40.1 (West 2002). Section 40.1(a) governs an applicant's petition "for a hearing before the Board to contest the decision" of the local siting authority. 415 ILCS 5/40.1(a) (West 2002). Section 40.1(b) governs a third parties' petition for a hearing, to which the rules in section 40.1(a) apply, as well as the Board's "procedural rules governing denial appeals." 415 ILCS 5/40.1(b) (West 2002). The Board's hearing is "to be based exclusively on the record" before the local body and "[t]he burden of proof shall be on the petitioner." 415 ILCS 5/40.1(b) (West 2002). In cases where the

-3-

local governing body has granted approval, the county board or the governing body of the municipality and the applicant shall be named co-respondents. 415 ILCS 5/40.1(b) (West 2002). The Board may take no new or additional evidence. 415 ILCS 5/40.1(a) (West 2002).

In making its determination, the Board shall include in its consideration the written decision and reasons for the decision of the local body and the transcribed hearing before that body. 415 ILCS 5/40.1(a) (West 2002). The hearing rules prescribed in sections 32 and 33(a) of the title X shall also apply. 415 ILCS 5/40.1(a) (West 2002), citing 415 ILCS 5/32, 33(a) (West 2002). The Pollution Control Board must consider all of the criteria, although a negative decision as to one of the criteria is sufficient to defeat an application for site approval of the pollution control facility. *City of Rockford v. County of Winnebago*, 186 Ill. App. 3d 303, 316 (1989). If there is no final action by the Board within 120 days after the date on which it received the petition, the site location may be deemed approved. 415 ILCS 5/40.1(a) (West 2002). Judicial review shall be afforded directly in the appellate court and not in the circuit court. 415 ILCS 5/41(a) (West 2002).

Here, on March 13, 2002, Town & Country filed an application for a new regional pollution control facility on a site recently annexed into the City of Kankakee. Town & Country's application proposed a new municipal solid waste landfill of approximately 400 acres with a waste footprint of 236 acres. The proposed landfill would provide service to surrounding counties. The City held a hearing on the Town & Country application under section 39.2(a) (415 ILCS 5/39.2(a) (West 2002)). Several objectors as well as numerous members of the public were present. Among the objectors were the County, Waste Management of Illinois, Inc., which operated a nearby landfill, and residents of Otto Township, which encompassed the proposed site. Although there are several issues raised by the hearing, we concentrate on only the evidence pertaining to criterion (ii) (415 ILCS 5/39.2(a)(ii) (West 2002)).

The salient evidentiary issue presented by this appeal concerns the potential groundwater impact of the proposed landfill. Accordingly, much of the evidence in the record concerns the site's geology and hydrogeology. The parties disputed whether the geology underneath the proposed site was an "aquifer" or an "aquitard." An aquifer is a geologic formation that permits the flow of water. An aquitard is a geologic formation that retards the flow of water. The resolution of

the aquifer/aquitard issue informed the City's determination as to whether the proposed facility was "so designed, located and proposed to be operated that the public health, safety and welfare will be protected." 415 ILCS 5/39.2(a)(ii) (West 2002).

Devin Moose testified, as a professional engineer, on behalf of Town & Country. Moose prepared the application and testified regarding the design and proposed operation of the proposed landfill. The application that Moose prepared stated that the area below the proposed landfill was generally not a reliable source of groundwater. Moose testified that the geology of the site consists of a relatively thin layer of glacial tills which were on top of the bedrock, otherwise called dolomite. Moose further characterized this bedrock as containing a "weathered" portion which exhibited higher permeability and could be considered an aquifer, and an "unweathered" portion which exhibited low permeability and could be considered an aquitard. His company, Envirogen, Inc., conducted 19 soil borings on the site. One of the borings extended 50 feet into the bedrock. An additional five of these borings penetrated the weathered bedrock, which was approximately five feet thick. His company conducted multiple tests which, according to Moose, demonstrated that the unweathered dolomite exhibits low permeability. He testified that the upper weathered layer of the dolomite bedrock was determined to be the uppermost aquifer. Accordingly, it was Moose's opinion that beneath the weathered bedrock the lower layer dolomite was a competent aquitard with low permeability.

Moose conducted computer modeling of the conditions at the site using models recognized and accepted by the Illinois Environmental Protection Agency. He testified that the computer models revealed no groundwater impact, on a 30-year basis, which was the expected operating life of the facility and projected similar results for a 1000-year duration. Moose's study was also based on a 1966 geologic study which characterized the site as an aquitard.

Town & Country's proposed design was as an inward gradient landfill. The construction of this design would begin with the removal of the glacial till and the weathered dolomite above the competent layer of dolomite and build the landfill on top of that bedrock. Moose testified that at the base of the landfill the glacial till and weathered dolomite would be removed. The surface of the competent dolomite would thereupon be exposed. Any fractures encountered would be grouted to a depth of 10 feet. The landfill would then be built on top

of that bedrock. Moose described a "composite" liner system proposed for the landfill. It would consist of a minimum of three feet of soil compacted to meet Illinois EPA requirements. Moose explained the design additionally consisted of an engineering structural fill, a 60-millimeter high-density polyethylene liner, and a leachate- collection system to remove liquid from the base of the landfill. Moose explained that an inward gradient between the uppermost aquifer and the landfill would prevent contaminants from leaking out of the landfill.

Hydrogeologist Stuart Cravens testified for the objectors. Cravens had coauthored a 1990 Illinois State Water Survey report of the aquifer in the Kankakee County area. The 1990 study covered 400 miles and ended 500 feet east of the proposed site that showed the dolomite as a major aquifer. It noted that 97% of the wells in eastern Kankakee and northern Iroquois Counties use the Silurian dolomite aquifer, and there are over 300 wells within two miles of Town & Country's proposed facility. Cravens testified that the 1966 study relied upon by Town & Country was no longer reliable because new data had led to a reassessment of the hydrogeologic characterization of the region. He also criticized Town & Country's study because he stated that one deep boring on the entire 236-acre site is not sufficient to determine the characteristics of the bedrock. Cravens opined that the entire depth of the Silurian dolomite below the site was an aquifer and that no landfill design could adequately protect the public at this location. Cravens admitted that he had not performed a site-specific evaluation. Cravens acknowledged that he was not competent to discuss the design of the proposed landfill.

Steven Van Hook, a senior hydrogeologist and project manager at an engineering firm, testified on behalf of Kankakee County. It was his testimony that Town & Country underestimated the extent of the uppermost aquifer and that this aquifer was much thicker than the five feet of weathered dolomite as identified from the existing borings. He could not conclude that the unweathered dolomite was an aquitard. He testified that one deep test boring is not sufficient to characterize the dolomite under the entire proposed site. He admitted that he was not qualified to testify on landfill design.

Professor Sandra Sixberry, a hydrogeologist who was not called by either party, testified as a member of the community. Professor Sixberry testified that in her opinion the Silurian dolomite was an aquifer. She felt that relying upon one site-specific boring to

determine the potential for dolomite to transfer water was an error. She admitted that she was not qualified as an engineer to testify on landfill design.

In response, Devin Moose testified of the intent of Town & Country to submit additional borings during the construction permitting process. He further testified regarding the ability of Town & Country to assure that the design meets the needs of the specific site based upon any additional borings which would generate alternate findings.

After the hearing, the City made findings of fact and conclusions of law. The City stated in its written decision, "There is evidence in the record that the bedrock may constitute an aquifer as opposed to an aquitard. However that evidence was contradicted or limited by the supporting evidence which was used to draw that conclusion." The City further concluded, "even if the Silurian Dolomite acts as an aquifer, there is sufficient evidence in the record to show that the design is adequate to assure the lack of movement of contaminates. This is not only based upon the liner system but also based upon the inward gradient engineering design." The City specifically requested additional conditions be imposed in order to provide additional assurance that the site was an aquitard and that the technical expertise of the IEPA could be used to provide additional protection. The City additionally found that the proposed facility was consistent with the County's solid waste management plan in accordance criterion (viii) of section 39.2(a) (415 ILCS 5/39.2(a)(viii) (West 2002)).

The County petitioned the Board for a hearing to contest the City's decision pursuant to section 40.1 of the Act (415 ILCS 5/40.1 (West 2002)). The Board considered the record developed before the City and heard additional evidence on the issue of fundamental fairness of the City hearing. It agreed with the City's finding that criterion viii was met and also found that the City's hearing was fair. Additionally, the Board held the City's conclusion that the "design of the landfill will protect the public health, safety, and welfare is against the manifest weight of the evidence because *** the landfill is located on an aquifer and T&C's design does not adequately address that fact." The Board concluded on criterion (ii):

> "Town & Country failed to address research indicating that the Silurian dolomite, upon which the proposed landfill would rest, is an aquifer. Town & Country also failed to consider well log data within a 2-mile radius of the site that indicated

area wells draw water from the Silurian dolomite aquifer. This evidence belies the findings of the tests on the single boring taken from the 236-acre waste footprint. Town & Country's scientifically unjustified assumption regarding the identity of the Silurian dolomite resulted in the use of inaccurate information in its modeling and groundwater impact evaluation. Consequently, Town & Country did not present sufficient details to show the landfill was located, designed, and proposed to be operated to protect public health, safety, and welfare. The evidence Town & Country did present was unreliable. Therefore, the Board finds it is clearly evident that the City's determination that Town & Country met the requirements fo criterion (ii) of Section 39.2 of the Act is against the manifest weight of the evidence."

Town & Country timely appealed the Board's decision. Waste Management of Illinois and Kankakee County cross-appealed from the Board's finding that the proceedings were fundamentally fair and that the City's decision on siting criterion (viii) was not against the manifest weight of the evidence.

The appellate court set aside the finding of the Board as to siting criterion (ii) and confirmed the remainder of the findings of the Board. The court first noted that the Board should apply the manifest weight of the evidence standard of review to the decision of the local siting authority as to criterion (ii). No. 3–03–0025 (unpublished order under Supreme Court Rule 23), citing *Waste Management of Illinois, Inc. v. Pollution Control Board*, 160 Ill. App. 3d 434, 440-41 (1987). After explaining this standard, the court noted:

> "In the instant matter, extensive expert testimony came before the [City], both in favor of and in opposition to the proposed site. Ultimately, a dispute developed over whether the site was an aquifer or an aquitard, and the public health consequences of the answer. On appeal, the parties expend much effort to explain why one expert or the other was more credible and ask this court to actually determine whether the site was an aquifer or an aquitard. In the final analysis, however, the decision belongs to the Council, and nothing in the record would support a conclusion that the Council's finding was against the manifest weight of the evidence." No. 3–03–0025 (unpublished order under Supreme Court Rule 23).

Justice Barry dissented. No. 3-03-0025 (unpublished order under Supreme Court Rule 23) (Barry, J., dissenting). He stated that the section 41(a) of the Act provides that any party to a Board hearing may obtain judicial review under the Administrative Review Law (735 ILCS 5/3–101 *et seq.* (West 2002)). Section 41(b) of the Act further provides that "any final order of the Board" shall be based on the evidence and "shall be invalid if it is against the manifest weight of the evidence." No. 3–03–0025 (unpublished order under Supreme Court Rule 23) (Barry, J., dissenting), citing 415 ILCS 5/41(b) (West 2002). Further, according to Justice Barry, our decision in *Environmental Protection Agency v. Pollution Control Board*, 115 Ill. 2d 65 (1986), required the appellate court to determine if the Board's findings, rather than the City's findings, were contrary to the manifest weight of the evidence.

Both Kankakee County and the Board filed petitions for leave to appeal with this court. 210 Ill. 2d R. 315. Leave to appeal was granted, and the separate appeals were consolidated.

ANALYSIS

According to the County and the Board, the plain language of the Act and the Administrative Review Law (735 ILCS 5/3–101 *et seq*. (West 2002)) require this court to review the Board's final administrative decision, not the interim decision of the local siting authority. Town & Country responds that the Act plainly requires appellate review of the City's decision, rather than the Board's, as the Board merely acts as an interim review and should not be accorded deference. We agree with the Board.

We initially note the purported split in authority in the appellate court on whether the appellate court should conduct its review of the Board's decision or that of the local siting authority. Compare *Turlek v. Pollution Control Board*, 274 Ill. App. 3d 244, 249 (1995) ("On review, we are to determine whether the Board's decision is against the manifest weight of the evidence"); *File v. D&L Landfill, Inc.*, 219 Ill. App. 3d 897, 901 (1991) ("standard of review to be exercised by both the Pollution Control Board and this court is whether, respectively, the decisions of the county board and the Pollution Control Board are contrary to the manifest weight of the evidence"), with *Concerned Adjoining Owners v. Pollution Control Board,* 288 Ill. App. 3d 565, 576 (1997) ("the court is limited to a determination of whether the siting authority's decision was contrary to the manifest

weight of the evidence"); *Fairview Area Citizens Taskforce v. Pollution Control Board*, 198 Ill. App. 3d 541 (1990); *Waste Management of Illinois, Inc. v. Pollution Control Board*, 160 Ill. App. 3d 434 (1987); *City of Rockford v. Pollution Control Board*, 125 Ill. App. 3d 384, 386-87 (1984). We find these cases to be of little value because each of them provided little to no analysis as to whether a court should apply its review directly to the siting authority's decision or the Board's decision. We begin instead with familiar rules of statutory construction.

The fundamental principle of statutory construction is to ascertain and give effect to the legislature's intent. *Alternate Fuels, Inc. v. Director of the Illinois Environmental Protection Agency*, 215 Ill. 2d 219, 237-38 (2004); *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 503-04 (2000). The language of the statute is the most reliable indicator of the legislature's objectives in enacting a particular law. *Alternate Fuels, Inc.*, 215 Ill. 2d at 238. We give statutory language its plain and ordinary meaning, and, where the language is clear and unambiguous, we must apply the statute without resort to further aids of statutory construction. *Alternate Fuels, Inc.*, 215 Ill. 2d at 238. We must not depart from the plain language of the Act by reading into it exceptions, limitations, or conditions that conflict with the express legislative intent. *Alternate Fuels, Inc.*, 215 Ill. 2d at 238. Moreover, words and phrases should not be construed in isolation, but must be interpreted in light of other relevant provisions of the statute. *Alternate Fuels, Inc.*, 215 Ill. 2d at 238.

All waste permitting is governed by title X of the Act (415 ILCS 5/39 through 40.2 (West 2002)). Generally, an applicant for a new pollution control facility must apply to the Agency to receive a permit. 415 ILCS 5/39(a) (West 2002). Senate Bill 172 amended the Act to require local government siting approval as a precondition to the issuance of an Agency permit. 415 ILCS 5/39.2 (West 2002). In other words, "no permit for the development or construction of a new pollution control facility may be granted by the Agency unless the applicant submits proof to the Agency that the location of the facility has been approved by the *** municipality." 415 ILCS 5/39(c) (West 2002).

Title XI of the Act pertains to judicial review. It provides, in relevant part:

> "(a) Any party to a Board hearing *** any person who has been denied a variance or permit under this Act, any party

-10-

adversely affected by a final order or determination of the Board *** may obtain judicial review, by filing a petition for review within 35 days from the date that a copy of the order or other final action sought to be reviewed was served upon the party affected by the order or other final Board action complained of, under the provisions of the Administrative Review Law *** except that review shall be afforded directly in the Appellate Court for the District in which the cause of action arose ***. ***

(b) Any final order of the Board under this Act shall be based solely on the evidence in the record of the particular proceeding involved, and any such final order for permit appeals, enforcement actions and variance proceedings, shall be invalid if it is against the manifest weight of the evidence." 415 ILCS 5/41(a), (b) (West 2002).

We read this section to require judicial review of *final* decisions, namely, the Board's decision.

Section 41 begins with expressly stating that the "Board" decision is the decision to be reviewed under the Administrative Review Law. 415 ILCS 5/41 (West 2002). The Act defines "Board" as the "Pollution Control Board" (415 ILCS 5/3.130 (West 2002)) and clearly and obviously excludes the local siting authority, whether a county or a municipality. Further, the statute refers to "final" order of the Board in several places. Only final orders of the Board are subject to judicial review. *Landfill, Inc. v. Pollution Control Board*, 74 Ill. 2d 541, 549 (1978). A final order is one that "determines the litigation on the merits so that, if affirmed, the only things [*sic*] remaining is to proceed with the execution of the judgment." *Archer Daniels Midland v. Pollution Control Board*, 149 Ill. App.3d 301, 304 (1986), citing *Flores v. Dugan*, 91 Ill. 2d 108, 113 (1982). Accordingly, the statute provides: "Any final order of the Board under this Act *** shall be invalid if it is against the manifest weight of the evidence." 415 ILCS 5/41(b) (West 2002).

Section 41(b) of the Act also requires that the manifest weight of the evidence standard applies to final Board orders in "permit appeals, enforcement actions and variance proceedings." 415 ILCS 5/41(b) (West 2002). Review of a Board order in a landfill siting proceeding is review of a "permit appeal" within the meaning of section 41(b). 415 ILCS 5/41(b) (West 2002). The provisions relating to siting approval and review of siting decisions are contained in title

X of the Act, entitled "Permits." 415 ILCS 5/39 through 40.2 (West 2002). Obtaining siting approval is part of the landfill permitting process. Section 39(c) states that "no permit for the development or construction of a new pollution control facility may be granted by the Agency unless the applicant submits proof *** that the location of the facility has been approved *** in accordance with Section 39.2 of this Act." 415 ILCS 5/39(c) (West 2002). Further, section 39.2 establishes procedures and criteria for local siting review. 415 ILCS 5/39.2 (West 2002). An appeal from a siting decision, therefore, is a "permit appeal" because it is an appeal from an order issued under title X, governing "permits," and it is an appeal from an order that is part of that permitting process. A developer who obtains approval from the local siting authority must still obtain the permission of the Illinois Environmental Protection Agency in order to construct and operate the facility. 415 ILCS 5/39(c) (West 2002); see *Land & Lakes Co. v. Pollution Control Board*, 319 Ill. App. 3d 41, 45 (2000).

Town & Country's reliance on sections 40 and 40.1 of the Act is misplaced. Section 40 sets forth the process for an "[a]ppeal of permit denial" to the Board (415 ILCS 5/40 (West 2002)), while section 40.1 sets forth the process for an "[a]ppeal of siting approval" to the Board (415 ILCS 5/40.1 (West 2002)). Town & Country argues that the Board's role under these two statutes is different, as the Board performs *de novo* review in the Agency permit denial because of the lack of an adversarial proceeding before the Illinois Environmental Protection Agency. In contrast, in siting approval appeals, the Board conducts its hearing upon a record prepared by the locality and applies the manifest weight of the evidence standard to the locality's findings. Town & Country asserts that these provisions demonstrate that the Board "merely acts as the first level of review for the final local decision" as compared to the appellate court, which also applies the manifest weight of the evidence standard. Therefore, Town & Country contends that the appellate court should not accord the deference of the manifest weight standard to the Board's decision, but rather the locality's decision. We disagree.

Sections 40 and 40.1 specify the path by which a Board hearing is obtained during different aspects of the permitting process. Both of those types of appeals to the Board are part of the permitting process, so they both are permit appeals under title X and within the meaning of section 41(b). Furthermore, section 40.1(b) grants the Board an important role in the permit process. Section 40.1 requires the

Board's technically qualified members to conduct a "hearing," which shall include the procedures outlined in sections 32 and 33 of the Act. 415 ILCS 5/40.1 (West 2002), citing 415 ILCS 5/32, 33(a) (West 2002). These sections require the Board to make factual and legal determinations on evidence. While the Board may not receive new or additional evidence, the statute still provides that the petitioner has the "burden of proof." 735 ILCS 5/40.1(a), (b) (West 2002).

More importantly, sections 40 and 40.1 of the Act do not refer to the local proceedings as "final." Indeed, sections 40 and 40.1 acknowledge that those proceedings are not final by authorizing unsuccessful applicants to "petition for a hearing before the Board to contest the decision" of the locality. 415 ILCS 5/40(a)(1), 40.1(a) (West 2002). Because the legislature has deemed the decision of the Board, rather than the decision of the locality, to be "final" in section 41, local decisions cannot be subject to direct judicial review within the provisions of section 41 (415 ILCS 5/41 (West 2002)). The appellate court may then review the Board's decision concerning the petition contesting the propriety of the underlying local decision, based only on the evidence presented during the local proceedings.

We also disagree with Town & Country that our case in *Environmental Protection Agency v. Pollution Control Board*, 115 Ill. 2d 65 (1986), requires a contrary result. In that case, this court explained that judicial review under section 41 of the Act requires the appellate court to determine whether the Board's decision is against the manifest weight of the evidence. While this court stated that there was a distinction between permit and siting cases, this court never considered whether the local siting authority or that of the Board is the final decision. It is true that the Board's consideration of an IEPA permit decision differs from its consideration of a local siting decision. But we based that distinction on the lack of an adversarial hearing under the regular permitting process. *Environmental Protection Agency*, 115 Ill. 2d at 70. Accordingly, we found that the Board was not required to apply the manifest weight of the evidence standard to review of an Agency's decision to deny a permit. The appellate court's review of the Board's decisions on either an appeal from an Agency permit decision or a local siting decision is the same.

Our holding is supported by the Administrative Review Law. Courts have jurisdiction to review administrative decisions only as provided by law. Ill. Const. 1970, art. VI, §§6, 9: *Collinsville Community Unit School District No. 10 v. Regional Board of School*

*Trustees*, 218 Ill. 2d 175, 181 (2006). When the appellate court undertakes direct review of an administrative decision, it exercises special statutory jurisdiction. *Collinsville*, 218 Ill. 2d at 182. "Special statutory jurisdiction 'is limited to the language of the act conferring it and the court has no powers from any other source.' " *Collinsville*, 218 Ill. 2d at 182, quoting *Fredman Brothers Furniture Co. v. Department of Revenue*, 109 Ill. 2d 202, 210 (1985). The jurisdiction of the court in this administrative review action, then, is limited by the statutes conferring special statutory jurisdiction. The Act, therefore, provides special statutory jurisdiction to this court only of final *Board* decisions, rather than the local siting authority's decision.

The Administrative Review Law is equally clear that only the Board's decision is subject to direct judicial review. That statute defines a reviewable decision as one "which terminates the proceedings before the administrative agency." 735 ILCS 5/3–101 (West 2002). The administrative proceedings are terminated with the Board's decision, not the local siting authority, here the City. Furthermore, the Administrative Review Law "shall apply to and govern every action to review judicially a final decision of any administrative agency." 735 ILCS 5/3–102 (West 2002). To hold that the City's decision is to be reviewed would read terms into the statute. As Town & Country readily urges, their view would make the Board's decision "irrelevant" and place authority as to technical decisions in local hands. We agree that the legislature could have explicitly provided direct review from the local board's decision. However, this provision may have conflicted with the Act's purpose "to establish a unified, state-wide program" to protect the citizens of Illinois from environmental harm. 415 ILCS 5/2(b) (West 2002). Accordingly, the legislature has viewed the Board as having "concurrent jurisdiction" over these decisions. *City of Elgin*, 169 Ill. 2d at 64. To accord the Board no meaningful role in the process yet still require its participation would lack sense. This proposition is further belied by the Act, which states that there is a "burden of proof" by the petitioner before the Board, and that the Board is to conduct a "hearing" in accordance with sections 32 and 33(a) of title X. 415 ILCS 5/40.1, 32, 33(a) (West 2002). The fact that the Board undertakes consideration of the record prepared by the local siting authority rather than preparing its own record does not render the Board's technical expertise irrelevant. Instead, the Board applies that technical expertise in examining the record to determine whether the record supported the local authority's conclusions.

In sum, we do not agree with Town & Country's interpretation of the Act. The fact that the legislature chose to bestow upon local governmental units the jurisdiction to participate in very specific ways in the state's unified regime of environmental protection is not persuasive evidence that the legislature in enacting the Illinois Environmental Protection Act more than a decade earlier intended to allow local siting authorities to have the final word on these issues.

Turning to the question of whether the Board's decision was against the manifest weight of the evidence, we first consider criterion (ii) (415 ILCS 5/39.2(a)(ii) (West 2002) (that the proposed facility is "so designed, located and proposed to be operated that the public health, safety and welfare will be protected")). The essential issue, as expressed in the Board's underlying reversal of the city council decision, is its disagreement with Town & Country's characterization of the underlying bedrock. The Board asserts that its decision was not against the manifest weight of the evidence, pointing to the testimony of Cravens, Van Hook, and Sixberry. Town & Country does not specifically argue that the Board's decision was against the manifest weight of the evidence, but, relying on their erroneous standard previously argued, points to Moose's testimony which demonstrates that the City's decision was supported by overwhelming evidence. The Board concluded that Town & Country's application erroneously assumed that the proposed landfill was situated on an aquitard. Town & Country's application states that the bedrock under the site is mainly dolomite about 250 to 275 feet thick and that "the bedrock surface became competent and served as an aquitard." Town & Country argues as to the importance of the fact that Cravens, Van Hook, and Sixberry were not engineers, and, according to Town & Country, unqualified to testify concerning landfill design. The County emphasizes that Town & Country's witness provided incompetent evidence that it was above an aquitard rather than an aquifer.

Moose testified that Town & Country concluded the underlying bedrock was an aquitard based on a single boring deeper than five feet, and at least 22 more borings would be needed and required by regulators. The Board concluded that this evidence was not sufficient to demonstrate that the bedrock was an aquitard and deemed that the landfill design was based on inaccurate scientific assumptions. Furthermore, Cravens, Van Hook, and Sixberry provided evidence that the site may be over an aquifer. We note that the City's

-15-

conclusion that the site was over an aquitard was not definitive. Rather, it requested additional assurances that the site was over an aquitard. We therefore reject Town & Country's contention that the evidence overwhelmingly demonstrated that the landfill was "so designed, located and proposed to be operated that the public health, safety and welfare will be protected." 415 ILCS 5/39.2(a)(ii) (West 2002). Rather, the Board's conclusion on criterion (ii) is not against the manifest weight of the evidence. The witness testimony, the fact that Town & Country's application was based on only one deep boring into competent bedrock on a 236-acre site, and that the 1966 study upon which the application was based has been superceded provides significant evidence that the site application did not meet criterion (ii). We therefore reverse the judgment of the appellate court and confirm the Board's decision on this point.

Because resolution of this issue is sufficient to decide this case, we need not discuss the remaining arguments in the briefs. See *City of Rockford v. County of Winnebago*, 186 Ill. App. 3d 303 (1989).

## CONCLUSION

For the foregoing reasons, the judgment of the appellate court is reversed and the order of the Board is confirmed.

*Appellate court judgment reversed;*
*Board order confirmed*.