THIRD DIVISION
December 24, 2008

No. 1-08-1258

| | | |
|---|---|---|
| THE PEOPLE *ex rel.* THE BOARD OF TRUSTEES OF CHICAGO STATE UNIVERSITY, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | |
| SIEMENS BUILDING TECHNOLOGIES, INC., a Delaware Corporation, | ) ) ) | |
| Defendant-Appellee | ) ) ) | |
| (Siemens Financial Services, Inc. f/k/a Siemens Credit Corporation, a Delaware Corporation, MBIA Capital Corporation 1999-B Tax Exempt Grantor Trust, a Delaware Corporation, | ) ) ) ) ) ) | No. 03 CH 13221 |
| Defendants and Third-Party Plaintiffs-Appellees; | ) ) ) | |
| Chapman and Cutler, LLP and David G. Williams, | ) ) ) | |
| Third-Party Defendants and Third-Party Plaintiffs-Appellees; | ) ) ) ) | |
| Nancy Kaye Hall-Walker, | ) ) | Honorable Peter A. Flynn |
| Third Party Defendant). | ) | Judge Presiding. |

JUSTICE THEIS delivered the opinion of the court:

This case appears before us on an interlocutory appeal pursuant to Supreme Court Rule

1-08-1258

308 (155 Ill. 2d R. 308) to consider three questions certified by the circuit court regarding the interpretation of the Public University Energy Conservation Act (the Act) (110 ILCS 62/1 *et seq.* (West 1998)). The People of the State of Illinois originally brought this action on behalf of the Board of Trustees of Chicago State University (the Board) against defendants, Siemens Building Technologies, Inc. (Siemens), Siemens Financial Services, Inc., f/k/a Siemens Credit Corporation (Siemens Financial), and MBIA Capital Corporation 1999-B Tax-Exempt Grantor Trust (MBIA) for declaratory relief, rescission, and breach of contract related to two agreements the Board entered into with defendants for the installation, purchase, and financing of certain energy conservation measures at the Chicago State University (the University) purportedly designed to provide guaranteed energy and operational cost savings.

In its fourth-amended complaint, the State alleged, *inter alia,* that the "Performance Services Agreement" the Board entered into with Siemens violated the energy savings guarantee under the Act and that Siemens breached various provisions in the Agreement relating to that guarantee. The State sought restitution, rescission and damages arising from the alleged shortfall in energy savings to the University. The circuit court ultimately dismissed several counts of the fourth-amended complaint, finding that the guarantee could not be properly evaluated until the end of the 10-year contract term. The court also dismissed certain counts relating to the enforceability of the "Master Lease Agreement" the Board originally entered into with Siemens Financial, holding that the Act did not prohibit the financing of the environmental conservation measures by a third-party lender or prohibit an unconditional payment provision in the lease. Subsequently, the court certified three questions for interlocutory appeal pursuant to Supreme

2

1-08-1258

Court Rule 308. 155 Ill. 2d R. 308.

    1.     "Can a university, under the 'annual' language of [the Act] §35, sue for reimbursement of a savings shortfall before the end of the [10][1]-year guarantee period specified in [the Act] §20?"

    2.     "Does [the] 2007 amendment to [the Act]§25 merely clarify the language of §25, or does it effect a substantive change?  If it effects a substantive change, is the change retroactive?"

    3.     "(a) Do[es] [the Act] §§5-15, 5-20, 15, 20, and 35 prevent the use of 'hell or high water' financing provisions under which the university must pay a lessor/financier for energy conservation measures even if the measures do not produce a savings to the university? [and] (b) Does the 2007 amendment to [the Act] §25 (see Question 2 *supra*) affect the answer to this question?  If so, in what way?"

For the following reasons, we answer the first certified question by holding that the Act does not require an annual reimbursement of a shortfall, but the parties are not prohibited from contracting for greater protections.  We need not answer the second certified question because we find the original intent of the statute can be discerned from the original legislative enactment.  We

---

[1] The question is framed in terms of a 20-year guarantee period because the Act was amended in 2006 by Public Act 94-1062, which amended section 20 to extend the time period from 10 to 20 years.  Pub. Act 94-1062, eff. July 31, 2006 (amending 110 ILCS 62/20 (West 2006)).  However, because the guaranteed energy savings contract in the present case was entered into prior to the amendment, we consider the preamended version of section 20 as it applies to this case.

3

1-08-1258

answer the first part of the third certified question in the negative, ruling that the Act does not prohibit the use of "hell or high water" financing clauses.

BACKGROUND

In March 1999, the Board entered into a 10-year "Performance Services Agreement" (the Agreement) with Siemens under which Siemens was to install various energy conservation measures for the University to reduce energy consumption and increase energy efficiency at the University. The parties agreed that this Agreement constituted a "guaranteed energy savings contract" as contemplated by the Act (110 ILCS 62/5-15 (West 1998)) and that Siemens was a "qualified provider" of these energy services and measures as that term is defined by the Act (110 ILCS 62/5-20 (West 1998)).

Pursuant to section 2 of the Agreement, Siemens guaranteed that the energy and operational cost savings generated over the ten-year term would be equal to or greater than the total cost incurred by the University to complete the project. The total cost of the energy conservation measures was approximately $6 million. The Board additionally agreed to pay approximately $2 million for a maintenance program. Siemens guaranteed that the University would realize a total of at least $10 million from energy, operational and capital savings.

Under subsection 2.2 of the Agreement, the parties set forth an accounting mechanism utilized to track the savings over the term of the Agreement. The amount of guaranteed annual savings was projected for each year of the contract term. At the end of each year, Siemens was responsible for documenting whether there was an excess in savings or a savings shortfall for each annual period based on its annual projections. If there were excess savings in any annual period,

4

Siemens would apply those savings toward the total guaranteed savings projected in the contract. However, if the actual annual energy savings fell short of the projected guaranteed savings for that year, the Board had two options: (1) carry over the shortfall into the next year and increase the savings guarantee amount for the next year; or (2) Siemens would pay the shortfall in the form of a credit toward the maintenance program.

In order to finance the purchase of these measures, in June 1999, the Board entered into a "Master Lease Agreement" (the Lease) with Siemens Financial. Under the Lease, the University borrowed over $6.2 million to purchase the energy conservation measures from Siemens and agreed to repay the loan by making annual payments to Siemens Financial of about $816,000 through 2009. The parties have given us little insight into the relationship between Siemens and Siemens Financial. However, under the Lease, the University holds title to the equipment purchased from Siemens and Siemens Financial holds a security interest in that equipment. The Lease also contains an unconditional rental payment clause the parties refer to as a "hell or high water clause" under which the Board's obligation to make the lease payments is unconditional, notwithstanding any breach of the Agreement by Siemens. As part of the execution of this Lease, Chapman and Cutler provided an opinion letter on behalf of the University presumably expressing the University's authorization to enter into the Lease. This letter does not appear in the record on appeal. Siemens Financial eventually assigned its rights in the Lease to another entity who, in turn, assigned its rights to MBIA.

Subsequently, in 2003, a dispute arose relating to the performance guarantee under the Agreement. The Board claimed that certain equipment it had purchased was not functioning

properly and claimed an energy savings shortfall of $3 million less than projected through the first four years of the Agreement. Based upon these claims, the Board stopped making payments under the Agreement in 2003. The State ultimately filed suit on behalf of the Board against Siemens Financial and MBIA. In its fourth-amended complaint, the State alleged, *inter alia,* that the performance guarantee in the Agreement violated sections 20 and 35 of the Act because the Act mandated that the "qualified provider" reimburse the University for energy savings shortfalls on an annual basis. Additionally, the State alleged that, in the alternative, the University had not realized the guaranteed energy savings projected under the Agreement. It sought, in part, reimbursement of the shortfall between projected annual savings and actual annual savings.

With respect to the financing, the State alleged, *inter alia*, that the Board was not authorized under the Act to enter into the Lease it executed because Siemens Financial and MBIA were not "qualified providers," and the unconditional rental payment clause was now void and illegal. The State argued the clause contravened the purpose of the Act because it required unconditional payment to the lessor regardless of whether the energy conservation measures produced the requisite savings to the University. It sought to recover all of the payments the University had made under the Lease.[2] The circuit court dismissed these claims, holding that the Act contemplated third-party financing from a lender other than a "qualified provider" and that

---

[2] Subsequently, Siemens Financial and MBIA filed a third-party claim against Chapman and Cutler based on their reliance on the opinion letter. Chapman and Cutler, in turn, brought a contribution action against the University's general counsel, Nancy Kaye Hall-Walker, for her role in structuring and approving the Agreement and Lease.

1-08-1258

the unconditional payment clause in the lease was not prohibited by the Act. We granted defendants' petition for leave to appeal.

ANALYSIS

Standard of Review

Our scope of review is governed by Supreme Court Rule 308(a). 155 Ill. 2d R. 308(a). Rule 308 provides an avenue of permissive appeal for interlocutory orders where the trial court has deemed that they involve a question of law as to which there is substantial ground for difference of opinion and where an immediate appeal from the order may materially advance the ultimate termination of the litigation. 155 Ill. 2d R. 308(a). We are generally limited to the questions certified by the trial court, which, because they must be questions of law and not fact, are reviewed *de novo.* Townsend v. Sears, Roebuck & Co., 227 Ill. 2d 147, 153, 879 N.E.2d 893, 897 (2007).

With these principles in mind, we address defendants' arguments that it is improper for the court to consider the first certified question under Rule 308 because (1) the State has not established an injury in fact, namely, that there indeed exists any energy shortfall; and (2) the Agreement provides for the remedy it seeks, namely, annual reimbursement of any shortfall.

We recognize that if a question certified by the trial court calls for a hypothetical answer with no practical effect, this court should refrain from answering it. Lawndale Restoration Ltd. Partnership v. Acordia of Illinois, Inc., 367 Ill. App. 3d 24, 27, 853 N.E.2d 791, 794 (2006). However, the State's underlying allegation, seeking a declaratory judgment that the Agreement is void and illegal, squarely implicates the interpretation of sections 35 and 20 of the Act relating to

7

reimbursement of energy savings shortfalls. For purposes of this appeal, we take the factual allegations as true (735 ILCS 5/2-619 (West 2006)), and note that the circuit court's dismissal of these counts was based, at least in part, on its interpretation of these statutory provisions. Accordingly, we consider the merits of the certified questions.

The Public University Energy Conservation Act

In order to better understand the certified questions before us, we begin with a brief overview of the Act as a whole. Initially, we note that the Act has never previously been subject to judicial interpretation and, therefore, this case presents a case of first impression.[3] The Act was enacted in 1997 by Public Act 90-486 (Pub. Act 90-486, eff. Aug. 17, 1997) to encourage and facilitate energy conservation and efficiency at public universities at no net cost to the university. 110 ILCS 62/1 *et seq.* (West 1998)[4]; see generally, D. Smith & J. Ferber, <u>Performance Contracting with State and Local Governments</u>, 25 Pub. Cont. L.J. 393, 394-95 (1996) (noting that energy savings contracts are considerably valuable to public entities because they allow the

---

[3] We also note that numerous other states and the federal government have similar types of legislation regarding guaranteed energy savings contracts and to our knowledge there has been no published judicial authority with regard to similar legislation in any other jurisdiction. Thus, we write on a clean slate.

[4] The Act mirrors three other similar statutes applying to local governments (50 ILCS 515/1 *et seq.* (West 1994)); public school districts (105 ILCS 5/19b-1 *et seq.* (West 1994)); and community colleges (110 ILCS 805/5A-5 *et seq.* (West 1994)). None of these statutes have been subject to judicial interpretation.

1-08-1258

entity to "use future energy savings to finance the cost" of conservation measures).

Under the Act, the Board is empowered to enter into a multiyear "guaranteed energy savings contract" (110 ILCS 62/5-15 (West 1998)) with a "qualified provider" (110 ILCS 62/5-20 (West 1998)) for the implementation of various "energy conservation measure[s]" (110 ILCS 62/5-10 (West 1998)) designed to reduce energy consumption and/or operating costs at the University. Pursuant to the guarantee provisions set forth in section 20 of the Act, the qualified provider must guarantee in writing that the actual energy and/or operational cost savings resulting from the implementation of these measures will meet or exceed the cost of implementing these measures within 10 years. 110 ILCS 62/20 (West 1998). The qualified provider must reimburse the university for any shortfall of guaranteed energy savings projected in the contract and must provide a sufficient bond to the university for the installation and performance of all of the energy conservation measures included in the contract. 110 ILCS 62/20 (West 1998).

Question One

"Can a university, under the "annual" language of [the Act] §35, sue for reimbursement of a savings shortfall before the end of the [10]-year guarantee period specified in [the Act] §20?"

The principles guiding our review are familiar. The fundamental rule of statutory construction is to ascertain and give effect to the legislature's intent. DeLuna v. Burciaga, 223 Ill. 2d 49, 59, 857 N.E.2d 229, 236 (2006). The language of the statute is the best indication of legislative intent, and we give that language its plain and ordinary meaning. Ready v. United/Goedeke Services, Inc., No. 103474, slip op. at 5 (November 25, 2008). In determining

9

the plain meaning of a statute's terms, we consider the statute in its entirety, keeping in mind the subject it addresses, and the apparent intent of the legislature in enacting the statute. Ready, slip op. at 5. We may not depart from the plain language of the statute by reading into it exceptions, limitations, or conditions that conflict with the express legislative intent. Town & Country Utilities, Inc. v. Illinois Pollution Control Board, 225 Ill. 2d 103, 117, 866 N.E.2d 227, 235 (2007). "[A] court should not attempt to read a statute other than in the manner in which it was written." Ultsch v. Illinois Municipal Retirement Fund, 226 Ill. 2d 169, 190, 874 N.E.2d 1, 13 (2007).

The State contends that under the plain language of sections 35 and 20, a qualified provider must reimburse a university for energy savings shortfalls annually. Conversely, Siemens maintains that under the plain language of the guarantee, any savings shortfalls cannot be realized until the end of the contract term. We begin by examining the language of each section. At the time of the parties' Agreement, section 20 provided in pertinent part as follows:

"The guaranteed energy savings contract shall include a written guarantee of the qualified provider that either the energy or operational cost savings, or both, will meet or exceed within 10 years the costs of the energy conservation measures. The qualified provider shall reimburse the public university for any shortfall of guaranteed energy savings projected in the contract. A qualified provider shall provide a sufficient bond to the public university for the installation and the faithful performance of all the measures included in the contract." 110 ILCS 62/20 (West 1998).

Based on the plain reading of the first sentence of section 20, the legislature intended to provide a guarantee to protect contracting public universities from incurring net costs for pursuing energy conservation measures and to provide energy and operational cost savings over the 10-year term of the contract. Thus, under the guarantee, the ultimate risk is allocated to the provider to establish that, at the end of the contract term, the energy and/or operational savings generated over the term of the contract will equal or exceed the cost of the energy conservation measures.

This construction of the first sentence is confirmed by section 15 of the Act (110 ILCS 62/15 (West 1998)) relating to the power of the Board to award a guaranteed energy savings contract to a qualified provider. That section provides that the Board is empowered to enter into this type of contract if it finds that "the amount it would spend on the energy conservation measures * * * would not exceed the amount to be saved in either energy or operational costs or both within a 10 year period from the date of installation." 110 ILCS 62/15 (West 1998).

The next sentence of section 20 refers specifically to the obligation of the provider to "reimburse the public university for any shortfall of guaranteed energy savings projected in the contract." 110 ILCS 62/20 (West 1998). It does not expressly indicate when the reimbursement is to occur. The State maintains that section 35 explains that the reimbursement is to be made on an annual basis.

Section 35 provides as follows:

"The public university shall document the operational and energy cost savings specified in the guaranteed energy savings contract and designate and reserve that amount for an annual payment of the contract. If the annual energy

11

savings are less than projected under the guaranteed energy savings contract the qualified provider shall pay the difference as provided in Section 20." 110 ILCS 62/35 (West 1998).

By its express language, the legislature intended that we construe sections 20 and 35 together. In doing so, the circuit court ruled as follows:

"Section 35 of the Act does call for keeping track of annual energy savings, but does not require payment (or netting out) except 'as provided in Section 20.' But [section] 20 contains a *ten-year* guarantee, not an annual guarantee. Thus, under [Section] 20 the provider guarantees that *over ten years* the energy savings will equal or exceed the conservation costs; and the provider must pay the shortfall if that guarantee is not met – which cannot be known until the ten years have elapsed. It follows that a university may incur interim excess costs during the ten-year period without triggering an immediate or annual reimbursement obligation."(Emphasis in original).

The State takes issue with this interpretation, asserting that the first sentence of section 20 is merely a "maximum payback period" and that section 35 must be understood in light of only the second sentence in section 20. However, Siemens maintains that the State's construction would eviscerate the language of the first sentence in section 20 and read into the second sentence of section 20 an "annual" reimbursement obligation where that language is not expressly mandated.

We are mindful that all provisions of a statutory enactment must be read as a whole. DeLuna, 223 Ill. 2d at 60, 857 N.E.2d at 236. We must not read each sentence in isolation but,

rather, interpret each sentence in light of other relevant provisions in the statute. Alternate Fuels, Inc. v. Director of the Illinois Environmental Protection Agency, 215 Ill. 2d 219, 238, 830 N.E.2d 444, 455 (2004). When section 35 and 20 are read together, the interpretation that comports with the "guarantee" is that "any shortfall" will be reimbursed at the end of the contract term rather than on an annual basis, because performance under the guarantee is not determined until the end of the contract term. Thus, Siemens' conception that there may be savings in some years and excesses in others, that the savings are reconciled under section 35 annually, and that any shortfalls is reimbursed, if necessary, at the end of the contract, comports with the overall guarantee expressed in section 20.

Nevertheless, the State maintains that requiring a university to wait until the end of a 10 or now 20-year contract term to seek reimbursement for any shortfall would violate several other provisions of the Act. It specifically directs our attention to section 5-15. 110 ILCS 62/5-15 (West 1998). Section 5-15 provides in pertinent part that a guaranteed energy savings contract "shall provide that all payments *** are to be made over time and the savings are guaranteed to the extent necessary to pay the costs of the energy conservation measures." 110 ILCS 62/5-15 (West 1998).

The State contends that this section means that the energy savings in any given year must be guaranteed to correspond to the amount needed to make "annual payments" under the contract, thereby allowing the University to not only leverage the savings, but, where there is a shortfall, apply a reimbursement to the next fiscal year's payment of the contract. Nevertheless, this construction would require us to add the word "annual" into the definition of a guaranteed

13

energy savings contract in section 5-15 and the guarantee provisions in section 20 even though that language is not included. It is not within our power to do so. Madison Two Associates v. Pappas, 227 Ill. 2d 474, 495, 884 N.E.2d 142, 156 (2008). Had the legislature intended that annual energy savings must correspond to annual payments, it could have explicitly so provided as other states have indeed done. See, *e.g*, Fla. Stat. Ann. §489.145(5)(b) (West 2006) ("the annual savings are guaranteed to the extent necessary to make annual payments"); Colo. Rev. Stat. Ann. §29-12.5-101(3)(e) (West 2006) ("[i]f all payments ***made by such board during any year subject to the guarantee***exceed the sum of utility cost savings and operational and maintenance savings for that year, such party shall forfeit to such board that portion of such moneys equal to the amount by which such payments exceeded such savings").

Section 35 does indicate that the University shall document the energy savings and "reserve that amount for an annual payment of the contract." However, the State's contention that section 35 "is clearly the 'true up' where the documented savings are compared with the annual payment and the provider is required to 'pay the difference' " is not what the statute provides. The "pay the difference" language refers to the difference between the actual and projected savings and not the difference between the savings and the annual payments. Accordingly, we reject this argument.

We are mindful that legislative intent can be discerned from ascertaining the consequences that would result from construing the statute one way or another. In re Detention of Lieberman, 201 Ill. 2d 300, 308, 776 N.E.2d 218, 223 (2002). If Siemens' construction is applied, the University argues it unfairly has to carry any shortfall until the end of the contract term. If the

1-08-1258

University's construction is applied, the consequence to the provider is that it may unfairly end up paying for shortfalls in the early years of the agreement despite excess savings over the course of the contract.

It appears that there are various ways to structure the guarantee in these statutes, as evidenced by other state legislation, suggesting that the structure posited by both the State and Siemens are both plausible and it was ultimately a policy decision as to where the General Assembly chose to allocate the risks over the term of the contract. See, *e.g.,* D. Smith & J. Ferber, Performance Contracting with State and Local Governments, 25 Pub. Cont. L.J., at 395-96 (1996) ("If the performance contractor fails to meet the annual savings guarantee, the performance contractor may be permitted to roll over the shortfall until the following annual reconciliation, with the intention that it may be offset by excess savings achieved in following years. In other cases, the performance contractor can elect or be required to make a shortfall payment to cover the difference between the guaranteed and actual savings. The determination of whether savings shortfalls are rolled over or paid to the governmental entity on an annual basis is often dictated by statute").

At some point, however, our role is to interpret the Act as written, and not to decide the wisdom of its provisions. People v. Ramirez, 361 Ill. App. 3d 450, 455, 837 N.E.2d 111, 117 (2005); see also Ready, slip op. at 11 (deciding between competing policies is a "task better left to the legislature"). Accordingly, since the Act does not expressly require an "annual" guarantee, we answer the first question in the negative, holding that under the Act the provider is not required to annually reimburse a university for energy savings shortfalls. However, nothing in the statute

15

1-08-1258

prohibits a public university from contracting for greater protections to avoid any potential interim risks to the university. As such, although the statute provides a broader guarantee, it does not prevent the parties from agreeing to an annual guarantee and annual reimbursement of any shortfall. We make no ruling on whether this Agreement provides for such reimbursement.

Question Two

"Does the 2007 amendment to [the Act] merely clarify the language of section 25, or does it effect a substantive change? If it effects a substantive change, is the change retroactive?"

Some background facts are necessary to an understanding of this question. At the time the Board entered into the Lease with Siemens Financial, section 25 of the Act provided in pertinent part as follows:

"A public university *** may enter into an installment payment contract or lease purchase agreement with a qualified provider for the purchase and installation of energy conservation measures. Each public university may issue certificates evidencing the indebtedness incurred pursuant to the contracts or agreements."

110 ILCS 62/25 (West 1998).

During the pendency of this litigation, on November 15, 2006, the trial court construed section 25 in its order denying Siemens Financial's and MBIA's motions to dismiss the third-amended complaint. Therein, it ruled that section 25 authorized public universities to finance energy savings measures exclusively through "qualified providers" who were guaranteeing the projected energy savings and who were required to post a bond under section 20 for their faithful

16

performance of the contract. Accordingly, the court held that since Siemens Financial and MBIA, as third-party financiers, did not meet that criteria, the Lease violated the Act.

Within three months of the trial court's ruling, on February 8, 2007, State Senators Cronin and Harmon introduced Senate Bill 1183 to amend section 25 of the Act. 95th Ill. Gen. Assem., Senate Bill 1183, 2007 Session. The bill was passed by the Senate on March 30, 2007, and became effective on September 11, 2007, as Public Act 95-612. The preamble to this legislation provides in pertinent part as follows:

> "WHEREAS, It is desirable for *** public universities *** to have flexibility in choosing the most appropriate means by which to pay for the costs of purchasing and installing energy conservation measures, including without limitation entering into installment payment contracts or lease purchase agreements with qualified providers or other third-party lenders, as authorized by law." Pub. Act 95-612, eff. September 11, 1997.

The actual amendment added the following italicized language:

> "A public university *** may enter into an installment payment contract or a lease purchase agreement with a qualified provider *or with a third-party lender, as authorized by law,* for the purchase and installation of energy conservation measures *by a qualified provider*. Each public university may issue certificates evidencing the indebtedness incurred pursuant to the contracts or agreements." Pub. Act 95-612, eff. September 11, 2007 (amending 110 ILCS 62/25 (West 2006)).

17

Thereafter, on January 14, 2008, the trial court vacated its earlier interlocutory ruling, recognizing the 2007 amendment to section 25 as a clarification of the legislature's original intent that the Act did not require that lenders to public universities be "qualified providers." Consequently, the court held that the third-party financing of the environmental conservation measures through the Lease was not prohibited under the Act.[5]

Initially, we must again consider the procedural posture of this case under Rule 308. By asking this court to consider the first part of question two, whether the 2007 amendment clarifies the intent of the original 1997 legislation, it assumes the premise that the drafters' intent cannot be ascertained from the statutory language alone. For it is only then that we can resort to tools of statutory interpretation to ascertain the meaning of a statute. Ready, slip op. at 5.

Although we recognize that under Rule 308, we are generally restricted to the certified question, we find that any answer to the certified question necessarily requires us to first consider the plain meaning of section 25 as originally enacted in 1997. Our supreme court has indicated that the legislative intent that controls the construction of a public act is the intent of the legislature which passed the subject act, and not the intent of the legislature which amends the act. O'Casek v. Children's Home & Aid Society, 229 Ill. 2d 421, 441, 892 N.E.2d 994, 1007 (2008). Courts must proceed cautiously when examining future legislative enactments for evidence of past legislative intent. O'Casek, 229 Ill. 2d at 441, 892 N.E.2d at 1007. Thus, we must first consider

---

[5] The trial court did not consider whether the Lease in this case constituted a "lease purchase agreement" as contemplated by the statute. We are not asked to make a determination in that regard.

18

the plain language of the preamended version of section 25.  See, *e.g.*, <u>Boyd v. Travelers</u> <u>Insurance Co.</u>, 166 Ill. 2d 188, 193, 652 N.E.2d 267, 270 (1995), quoting 134 Ill. 2d R. 366(a)(5) (explaining that in the interest of judicial economy and reaching an equitable result, a reviewing court may go beyond the certified question to consider the order giving rise to an appeal).

Section 25, as it existed when the parties entered into the Lease, provided that a university "may" enter into an installment contract or lease purchase agreement with a qualified provider for the purchase and installation of the energy conservation measures.  110 ILCS 62/25 (West 1998). In other sections of the Act, the relationship between the university and the qualified provider is strictly mandated.  For example, the qualified provider "shall reimburse" (110 ILCS 62/20 (West 1998)) or "shall provide a sufficient bond" (110 ILCS 62/20 (West 1998)).  However, in section 25, by using the flexible term "may," the General Assembly neither expressly required a lease be entered into with only a qualified provider nor expressly prohibited a lease with a third-party lender.  <u>People v. Reed</u>, 177 Ill. 2d 389, 393, 686 N.E.2d 584, 586 (1997) (usually the legislature's use of the word "may" is regarded as indicating a permissive or directory reading, whereas the use of the word "shall" is considered to express a mandatory reading).  Thus, an inference can be made that the General Assembly intended to provide the public universities with some flexibility and discretion in the way they finance these contracts.

We are also mindful that we must construe the Act in light of other relevant statutes related to the Board's statutory authority.  Under its enabling statute, the Chicago State University Law (110 ILCS 660/5-1 *et seq.* (West 1998)), the Board is "a body politic and corporate" (110 ILCS 660/5-10 (West 1998)), and has the statutory power generally to enter into

contracts and expend funds appropriated to the University provided that it "shall not create any liability or indebtedness of funds from the State Treasury in excess of the funds appropriated to [the University]" (110 ILCS 660/5-40 (West 1998)). Nothing in the Act warrants the conclusion that the legislature intended to affect the university's existing contracting authority.

Moreover, we must construe statutes in a practical and common sense manner. Jones v. Industrial Comm'n, 188 Ill. 2d 314, 328, 721 N.E.2d 563, 570 (1999). The Act is a mechanism for public universities to make costly energy saving improvements without large up-front outlays of funds from State revenue sources. Third-party financing is a viable means to accomplish that objective. See D. Smith & J. Ferber, Performance Contracting with State and Local Governments, 25 Pub. Cont. L.J., at 397-98 (1996) (third-party financing is typical in energy performance contracts because public entities rarely have the cash readily available and bonds can be time-consuming and involve higher transaction costs). In contrast, qualified providers, as defined by the statute, have expertise in the design, implementation or installation of energy conservation measures. 110 ILCS 62/5-20 (West 1998). They are not in the financial lending business. See D. Smith & J. Ferber, Performance Contracting with State and Local Governments, 25 Pub. Cont. L.J., at 398 (1996) (The provider will often assign its right to receive payments from the public entity to a third-party lender in order to obtain the present cash value of those funds). Thus, any interpretation that would limit the financing of these contracts to only qualified providers would severely constrain the ability of public universities to enter into these contracts to achieve the stated purpose of the Act. Accordingly, for all of these reasons, we find that the plain meaning of section 25 as originally enacted in 1997 does not prohibit the use of third-party

financing.

In light of our holding, we need not consider whether the 2007 amendment, expressly allowing financing through third-party lenders "as authorized by law," was a clarification nor do we need to address whether the 2007 amendment was a substantive change that applies retroactively. Nevertheless, even if we were to consider whether the 2007 amendment was a clarification, although not necessary to our disposition, we would find that the statements made by the cosponsor of the amendment inform and support our conclusion.

Senate Bill 1183 was introduced three months after the circuit court's ruling. The comments of Senator Cronin, the Senate co-sponsor of Senate Bill 1183, strongly support that the amendment was intended to clarify existing law with respect to the financing of these contracts. During the limited floor debate, Senator Cronin stated in pertinent part as follows:

> "This seeks to clarify a little technical misunderstanding with regard
> to qualified providers. Qualified providers means people that are
> qualified, yes, to do the energy conservation work, but we also
> want qualified lenders. We clarify this in the bill. We want to make
> sure that a lender need not be [an] environmental energy
> conservation expert. So I think this is all clarified." 95th Gen.
> Assem., Senate Proceedings, March 30, 2007, at 117 (statements of
> Senator Cronin).

In sum, nothing in the preamended section 25 would prohibit the Board from entering into a lease purchase agreement with a third party lender, and the statements of the cosponsor of the

1-08-1258

2007 amendment support that conclusion.

Question Three

(a) "[Do sections 5-15, 5-20, 15, 20 and 35 of the Act] prevent the use of 'hell or high water' financing provisions under which the university must pay a lessor/financier for energy conservation measures even if the measures do not produce a savings to the university?"

(b) "Does the 2007 amendment to [section 25 of the Act] affect the answer to this question? If so, in what way?"

The unconditional payment clause referred to as a "hell or high water" financing provision in the Lease requires the University to continue to pay Siemens Financial or its assignee the debt notwithstanding any alleged failure of the qualified provider to perform its obligations under the guaranteed energy savings contract.

These types of unconditional payment provisions are common in commercial equipment leases. See 810 ILCS 5/2A-407 (West 2006) (specifically sanctioning "hell or high water" clauses in finance leases); see also O.P.M. Leasing Services, Inc. v. Hassett, 21 B.R. 993, 999 (Bankr. S.D.N.Y.1982) (State of West Virginia as lessee of computer equipment could not terminate the lessor's assignee's unconditional right to payment under a "hell or high water" clause). Given that section 25 expressly contemplates the "lease purchase agreement" structure of financing, and given that the "hell or high water" clause is apparently an ordinary financing term in these contracts that is not expressly excluded here, this provision does not appear to be prohibited under the Act.

22

1-08-1258

Defendants maintain that the protections provided to public universities under the Act are not lost by the inclusion of this clause. We agree. Nothing in a "hell or high water clause" would prevent the public universities from enforcing their rights under the performance guarantee against the qualified provider and nothing in that clause impacts the bond requirements of the qualified provider under section 20 of the Act. 110 ILCS 62/20 (West 1998). However, the State argues that this interpretation would require the universities to make payments to the lender, including financing costs, for up to 20 years for faulty energy conservation measures.[6]

The State's argument is essentially a continuation of the State's construction of section 35 and 20 in relation to the obligations the *provider* owes to a university and does not equate with an argument that an unconditional payment obligation to the *lender* is violative of the Act. If we presume for purposes of this question that third-party financing was contemplated by the legislature, then the commercial reality of this type of lease makes it clear that the risk as between the lessee and lessor for defective equipment is to be placed on the lessee who has recourse against the supplier. 810 ILCS 5/2A-407 (West 2006). Under the construction of the Act, the recourse against the supplier is guaranteed, albeit delayed. Accordingly, for all of the foregoing reasons, we answer the third certified question in the negative, holding that the Act does not prohibit the use of "hell or high water" financing. In light of our ruling, we need not consider the affect of the 2007 amendment.

---

[6] We note that prior to entering into a guaranteed energy savings contract, the public university must evaluate the cost of "debt service" which would include financing costs. 110 ILCS 62/10 (West 1998).

23

Certified questions answered; cause remanded.

QUINN and COLEMAN, JJ., concur.